UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
PARK YIELD LLC,

                      Plaintiff,

       -against-

ERIC BROWN; BESC REALTY COMPANY LLC;
STERLING MANAGEMENT, LLC; 4 SQUARE
MANAGEMENT, LLC; PARK PRO SYSTEMS, LLC;
and JOHN DOES 1 AND 2,

                      Defendants.
------------------------------------------------------------x

MEMORANDUM DECISION
AND ORDER

18 Civ. 1947 (GBD) (SN)

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: DEC 0 6 2019

GEORGE B. DANIELS, United States District Judge:

Plaintiff Park Yield LLC brings this action for securities fraud against Defendants Eric Brown, Ian Brown, John Doe 1, BESC Realty Company LLC ("BESC"), Sterling Management, LLC ("Sterling"), 4 Square Management, LLC ("4 Square"), and Park Pro Systems, LLC ("Park Pro"), accusing them of selling unregistered securities to Plaintiff, as well as failing to disclose Eric Brown's criminal conviction to Plaintiff prior to such sale. (Am Compl., ECF No. 46.)[1] Defendants move to dismiss Plaintiff's complaint for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6). (Defs.' Am. Mot. to Dismiss, ECF No. 52.)[2] Plaintiff cross-moves for partial summary judgment pursuant to Federal Rule of Civil Procedure 56 on its claim that Defendants violated Section 5 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C.

---

[1] The caption of Plaintiff's amended complaint lists John Doe 2 as a Defendant, but the body of the document makes no reference to John Doe 2 and instead mentions Ian Brown, who is not included in the case caption. (See, e.g., id. ¶ 5 (identifying Ian Brown as a party).) This Court presumes that Ian Brown refers to John Doe 2.

[2] Defendants also argue that Plaintiff is barred from bringing this action under Section 808(a) of the New York Limited Liability Company Law because Plaintiff is a foreign limited liability company unauthorized to do business in New York. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss ("Defs.' Mem."), ECF No. 50, at 11–14.) Because this Court grants Defendants' motion under Rule 12(b)(6), it declines to address this alternative ground for dismissal.

§ 77e(a), by selling unregistered securities. (Notice of Mot., ECF Nos. 53, 54.) Defendants' motion to dismiss is GRANTED. Plaintiff's cross-motion for partial summary judgment is DENIED.

## I. FACTUAL BACKGROUND

Plaintiff Park Yield LLC is a limited liability company wholly owned and managed by non-party Alexander Kravets. (Am. Compl. ¶ 3.) Defendant Eric Brown is the controlling shareholder of limited liability companies BESC, Sterling, 4 Square, and Park Pro. (*Id.* ¶ 4.) His brother, Ian Brown, owns a fifty percent interest in Park Pro, which is the manager of Sterling and 4 Square. (*Id.* ¶ 5.) BESC is the majority shareholder of Sterling and 4 Square, (*id.* ¶ 7), both of which operate parking garages, (*id.* ¶ 1).

Plaintiff alleges that in July 2017, Defendant Eric Brown solicited Kravets to invest in five "parking facility ventures." (*Id.* ¶ 18.) Kravets ultimately decided to invest in two of those ventures—those operated by Sterling and 4 Square. (*Id.* ¶ 19.) Accordingly, Plaintiff and Defendant Sterling entered into an Investment and Operation Agreement dated July 28, 2017 (the "Sterling Agreement"), under which Plaintiff purchased a forty percent equity interest in Sterling for $150,000. (*Id.* ¶¶ 21–22; *see also* Am. Compl., Ex. D (Sterling Agreement), ECF No. 46-4, at 1.) Plaintiff and Defendant 4 Square entered into a similar Investment and Operation Agreement dated August 3, 2017 (the "4 Square Agreement," together with the Sterling Agreement, the "Agreements"), under which Plaintiff purchased a forty percent equity interest in 4 Square for $130,000. (Am. Compl. ¶¶ 28–29; *see also* Am. Compl., Ex. E (4 Square Agreement), ECF No. 46-5, at 1.)[3] In exchange, the Agreements provide that Sterling and 4 Square are to each make distributions to Plaintiff equal to (1) forty percent of their net profits, to be paid monthly, and

---

[3] The sections in the Agreements appear to be numbered incorrectly. Accordingly, in citing the Agreements, this Court will reference the relevant page as opposed to the relevant section number.

(2) ten percent of Plaintiff's initial investment per year, to be paid in equal monthly installments. (Am. Compl. ¶¶ 23, 30; Am. Compl., Ex. D (Sterling Agreement), at 1; Am. Compl., Ex. E (4 Square Agreement), at 1.)

Both Agreements identify Plaintiff as "Investor #1," non-party Little Italy Parking LLC as "Investor #2," (Am. Compl., Ex. D (Sterling Agreement), at 1; Am. Compl., Ex. E (4 Square Agreement), at 1), and Defendant Park Pro as the "Manager" of Sterling and 4 Square, (Am. Compl., Ex. D (Sterling Agreement), at 6; Am. Compl., Ex. E (4 Square Agreement), at 6). The Agreements specify that Sterling and 4 Square "shall make any and all business decisions related to the company," (Am. Compl., Ex. D (Sterling Agreement), at 2; Am. Compl., Ex. E (4 Square Agreement), at 2), and "will remain responsible for the day-to-day, mid-range and long-term operational strategies related" thereto, (Am. Compl., Ex. D (Sterling Agreement), at 5; Am. Compl., Ex. E (4 Square Agreement), at 5).

The Agreements include several representations and warranties. They state that Plaintiff:

> understand[s] that [Sterling's and 4 Square's] Shareholder Interests have not been registered either with the Securities and Exchange Commission (the "SEC") or with the securities commission of any state and are being offered and sold pursuant to private offering exemptions provided in Section 4(2) of the Securities Act of 1933, as amended[,] Regulation D promulgated by the SEC and applicable state securities laws.

(Am. Compl., Ex. D (Sterling Agreement), at 3; Am. Compl., Ex. E (4 Square Agreement), at 3.) Within the Agreements, Plaintiff acknowledged that "there is not and will not be a public market for [its] Shareholder Interest in [Sterling and 4 Square] and that the transferability of [its] Shareholder Interest in [Sterling and 4 Square] is restricted." (Am. Compl., Ex. D (Sterling Agreement), at 3; Am. Compl., Ex. E (4 Square Agreement), at 4.) Moreover, Plaintiff represented that it was investing in Sterling and 4 Square "solely for [its] own account, for investment purposes only, and intending to make a profit therefrom, and not with a view to distribute, sell, subdivide,

3

or for the account of any other individual, corporation, firm or person." (Am. Compl., Ex. D (Sterling Agreement), at 3; Am. Compl., Ex. E (4 Square Agreement), at 4.) The Agreements further provide that Plaintiff "shall have no unconditional right to give, sell, assign, pledge, hypothecate, exchange or otherwise transfer to another, all or any part of its Membership Interest in [Sterling or 4 Square]," and that prior to securing such right, Plaintiff "must give written notification of the proposed transfer to [Sterling or 4 Square] of the intention to sell [its] Membership Interest." (Am. Compl., Ex. D (Sterling Agreement), at 6; Am. Compl., Ex. E (4 Square Agreement), at 6.)

Plaintiff also represented that it "had an opportunity to engage in any and all due diligence required prior to the signing" of the Agreements. (Am. Compl., Ex. D (Sterling Agreement), at 1; Am. Compl., Ex. E (4 Square Agreement), at 1.) It stated that its "knowledge and experience in financial and business matters in general and in speculative investments such as [Sterling and 4 Square] in particular, are such that [it] is capable of evaluating the merits and risks of investment in [Sterling and 4 Square]." (Am. Compl., Ex. D (Sterling Agreement), at 3; Am. Compl., Ex. E (4 Square Agreement), at 3–4.) Finally, Plaintiff stated that it "had the opportunity to review th[e] Agreement[s] and consult with legal and other advisors of [its] choice." (Am. Compl., Ex. D (Sterling Agreement), at 8; Am. Compl., Ex. E (4 Square Agreement), at 9.)

Plaintiff's complaint alleges that neither Sterling nor 4 Square has made any distributions to Plaintiff as provided under the Agreements, (Am. Compl. ¶ 36), and that unbeknownst to Plaintiff, the interests that it purchased were securities that required registration with the SEC, (*id.* ¶ 60). Plaintiff further alleges that Eric Brown, "as signatory to [the Agreements] and by virtue of his control over the Corporate Defendants," falsely represented and warranted in the

4

Agreements that no registration of the interests was required in connection with the execution of the Agreements. (*Id.* ¶¶ 27, 34.)

According to Plaintiff, the "fraudulent misrepresentations and omissions" that Eric Brown made to "induce" Plaintiff to purchase the interests "are part of a pattern of behavior consistent with the market manipulation scheme" to which he had pleaded guilty in 2014. (*Id.* ¶ 37.) Specifically, in 2014, Eric Brown pleaded guilty to felony mail fraud in connection with his alleged participation in a fraudulent securities market manipulation scheme. (*Id.* ¶¶ 2, 15.) Plaintiff alleges that Eric Brown did not disclose his criminal conviction to Plaintiff's principal, Kravets, until August 17, 2017—after the sale of the interests at issue here. (*Id.* ¶ 61.)

Plaintiff's first cause of action alleges that all Defendants violated Section 5 of the Securities Act by using interstate means to sell unregistered securities to Plaintiff. (*Id.* ¶¶ 39–54.) Plaintiff's remaining causes of action assert that Eric Brown violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, and committed common law fraud and negligent misrepresentation, by (1) failing to disclose his 2014 conviction to Plaintiff before selling the alleged securities, and (2) falsely misrepresenting to Plaintiff that the alleged securities need not be registered with the SEC. (*Id.* ¶¶ 55–84.)

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) Motion to Dismiss.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must demonstrate "more than a sheer possibility that a defendant has acted unlawfully"; stating a

5

facially plausible claim requires the plaintiff to plead facts that enable the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citation omitted). The factual allegations pled must therefore "be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citation omitted).[4]

A district court must first review a plaintiff's complaint to identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 679. The court then considers whether the plaintiff's remaining well-pleaded factual allegations, assumed to be true, "plausibly give rise to an entitlement to relief." *Id.*; *see also Targum v. Citrin Cooperman & Co., LLP*, No. 12 Civ. 6909 (SAS), 2013 WL 6087400, at *3 (S.D.N.Y. Nov. 19, 2013). In deciding the 12(b)(6) motion, the court must also draw all reasonable inferences in the non-moving party's favor. *See N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 119–20 (2d Cir. 2013).

**B. Rule 56 Motion for Summary Judgment.**

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Gayle v. Gonyea*, 313 F.3d 677, 682 (2d Cir. 2002) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 248).

---

[4] "In deciding a motion to dismiss under Rule 12(b)(6), the court may refer 'to documents attached to the complaint as an exhibit or incorporated in it by reference, to matters of which judicial notice may be taken, or to documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit.'" *Fishbein v. Miranda*, 670 F. Supp. 2d 264, 271 (S.D.N.Y. 2009) (quoting *Brass v. Am. Film Tech., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)).

The party seeking summary judgment has the burden of demonstrating that no genuine issue of material fact exists. *See Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). In turn, to defeat a motion for summary judgment, the opposing party must raise a genuine issue of material fact. *See Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002). To do so, it "must do more than simply show that there is some metaphysical doubt as to the material facts," *id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), and it "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Rather, the opposing party must produce admissible evidence that supports its pleadings. *See First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289–90 (1968). In this regard, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) (quoting *Anderson*, 477 U.S. at 252).

In determining whether a genuine issue of material fact exists, the court must construe the evidence in the light most favorable to the opposing party and draw all inferences in that party's favor. *See id.* However, "a court must not weigh the evidence, or assess the credibility of witnesses, or resolve issues of fact." *Victory v. Pataki*, 814 F.3d 47, 59 (2d Cir. 2016) (citation omitted). Summary judgment is therefore "improper if there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party." *Marvel*, 310 F.3d at 286.

### III. PLAINTIFF'S SECTION 5 CLAIM IS DISMISSED BECAUSE THE INTERESTS ARE SECURITIES EXEMPT FROM REGISTRATION

Section 5 of the Securities Act prohibits the sale of unregistered securities unless the offering is covered by an exemption. 15 U.S.C. § 77e; *see SEC v. Sourlis*, 851 F.3d 139, 143 (2d Cir. 2016). To state a cause of action under Section 5, a plaintiff must show "(1) lack of a

7

registration statement as to the subject securities; (2) the offer or sale of the securities; and (3) the use of interstate transportation or communication and the mails in connection with the offer or sale." *SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006) (citation omitted). "Once a prima facie case has been made, the defendant bears the burden of proving the applicability of an exemption." *Id.* (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126 (1953)).

### A. The Interests That Plaintiff Purchased Are Securities.

It is undisputed that no registration statements were filed or were in effect with respect to the interests that Plaintiff purchased. (*See* Compl. ¶ 41; Answer, ECF No. 22, ¶ 41.) Nor is there any dispute over the sale of the interests and the use of interstate means in connection with the sale. (*See* Statement of Material Facts, ECF No. 54-2, ¶¶ 7, 9, 12–14; Defs.' Rule 56 Counter-Statement, ECF No. 59, ¶¶ 7, 9, 12–14.) The parties dispute, however, whether the interests are legally considered "securities" within the meaning of Section 2(1) of the Securities Act, which defines a "security" to include, *inter alia*, an "investment contract." 15 U.S.C. § 77b(a)(1).

In assessing whether an offering constitutes an "investment contract"—and, in turn, a security—courts generally apply the Supreme Court's test as articulated in *SEC v. W. J. Howey Co.*, 328 U.S. 293 (1946). Under *Howey*, an offering is an investment contract where there is "(i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits to be derived solely from the efforts of others." *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 352 (S.D.N.Y. 2019) (citation omitted); *see also Howey*, 328 U.S. at 301 ("The test is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others.").

Although Defendants do not dispute that the first and second prongs of the *Howey* test are satisfied here, they contend that Plaintiff cannot prove that the third prong is met because under

8

the Agreements, Plaintiff allegedly received "a significant amount of control and management oversight over Defendants' operations." (Defs.' Mem. at 5.) As evidence of Plaintiff's alleged "broad" management rights, Defendants point, for example, to Plaintiff's "right to audit the Defendants' books and records" and "right to approve any new loans, lines of credit and the granting of securities interests by Defendants." (*Id.* at 6–7.) Accordingly, Defendants claim that rather than being a "mere passive investor," Plaintiff "purchased a business interest in a partnership that made . . . Plaintiff an active member of management of Defendants Sterling and 4 Square." (*Id.* at 5.)

Contrary to Defendants' assertions, both Agreements express a clear understanding that the interests are "securities." Specifically, the Agreements state that the "Shareholder Interests . . . are being offered and sold pursuant to private offering exemptions provided in Section 4(2) of the Securities Act of 1933, as amended . . ., Regulation D promulgated by the SEC and applicable state securities laws." (Am. Compl., Ex. D (Sterling Agreement), at 3; Am. Compl., Ex. E (4 Square Agreement), at 3.) Indeed, Defendants "concede . . . that the [A]greements included the term 'security.'" (Defs.' Mem. in Reply and in Opp'n to Pl.'s Mot. for Partial Summ. J. ("Defs.' Reply"), ECF No. 57, at 4.) Their insistence that this Court simply ignore the express terms of the Agreements is therefore unavailing. *See Law Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 467 (2d Cir. 2010) ("[T]he court should not find the contract ambiguous where the interpretation urged by one party would 'strain [ ] the contract language beyond its reasonable and ordinary meaning.'" (second alteration in original) (citation omitted)).

To be sure, in analyzing whether an offering satisfies the *Howey* test, "form should be disregarded for substance," *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967), and the emphasis should be on the "economic realities underlying a transaction, and not on the name appended

9

thereto," *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975). Here, however, there is nothing in the Agreements that suggests that Plaintiff is anything more than a passive investor. The Agreements expressly identify Plaintiff as "Investor #1" and Park Pro as "Manager" of Sterling and 4 Square. (Am. Compl., Ex. D (Sterling Agreement), at 1, 6; Am. Compl., Ex. E (4 Square Agreement), at 1, 6.) Moreover, Section V.a of both Agreements reserves the management of all "day-to-day, mid-range and long-term operational strategies" with Sterling and 4 Square, "including hiring and firing of employees, making investment decisions, depositing revenues and paying bill and invoices upon valid presentment thereof, book-keeping, hiring outside professionals, and any and all other day to operational aspects of the business." (Am. Compl., Ex. D (Sterling Agreement), at 5; Am. Compl., Ex. E (4 Square Agreement), at 5.) In short, Plaintiff does not have any power to operate or to affect the success or profitability of either company, nor does it have a meaningful role in their management. Accordingly, the interests that Plaintiff purchased in Sterling and 4 Square qualify as securities.

### B. The Interests Are Exempt from Registration.

Defendants argue that even if the interests qualify as securities, they are exempt from registration under Section 4(a)(2) of the Securities Act. Section 4(a)(2), previously known as Section 4(2), states that Section 5's registration requirement "shall not apply to ... transactions by an issuer not involving any public offering." 15 U.S.C. § 77d(a)(2); *see Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 590 (S.D.N.Y. 2018). To determine whether this exemption applies, a court must examine "whether the particular class of persons affected need the protection of the [Securities] Act," because "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" *Anegada Master Fund, Ltd. v. PXRE Grp. Ltd.*, 680 F. Supp. 2d 616, 622 (S.D.N.Y. 2010) (first alteration in original)

10

(quoting *SEC v. Ralston Purina Co.*, 346 U.S. 119, 125 (1953)). "[T]he governing fact is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have such information as a registration would have disclosed, or have access to such information." *Feldman v. Concord Equity Partners, LLC*, No. 08 Civ. 4409 (CS), 2010 WL 1993831, at *3 (S.D.N.Y. May 19, 2010) (alteration in original) (quoting *Gilligan, Will & Co. v. SEC*, 267 F.2d 461, 466 (2d Cir. 1959)). "Factors commonly considered in determining whether an offering is public include: '(1) the number of offerees; (2) the sophistication and experience of the offerees; (3) the nature and kind of information which has been provided; (4) the size of the offering and the precautions taken to prevent the offerees from reselling their securities.'" *Id.* (citation omitted).

Here, the Agreements unambiguously state Plaintiff's "understand[ing] that [Sterling's and 4 Square's] Shareholder Interests have *not been registered* either with the Securities and Exchange Commission . . . or with the securities commission of any state and are being offered and sold pursuant to *private offering exemptions provided in Section 4(2) of the Securities Act*." (Am. Compl., Ex. D (Sterling Agreement), at 3; Am. Compl., Ex. E (4 Square Agreement), at 3 (emphasis added).) Plaintiff was therefore fully informed at the time of purchase that the interests were exempt from registration. Courts have previously found similar provisions to be "destructive" of a plaintiff's Section 5 claim. *See, e.g.*, *Noz v. Value Investing Partners, Inc.*, No. 98 Civ. 6977 (RO), 1999 WL 387400, at *1 (S.D.N.Y. June 14, 1999) (finding that plaintiffs were aware of registration exemption given their acknowledgement in agreement that "the Shares are not being registered under the Securities Act . . . based in part, on reliance that the issuance of the Shares is exempt from registration under Section 4(2) of the Act as not involving any public offering"); *see also Feldman*, 2010 WL 1993831, at *4 (finding no violation of Section 5 in part

11

because plaintiff was "well aware of the provision in the Operating Agreement stating that the units were intended to be exempt from registration"). Plaintiff cannot have it both ways, to argue on the one hand that the Agreements are unambiguous as to whether the interests are securities, but, on the other hand, are ambiguous as to whether the interests are exempt from registration—particularly when both questions are specifically addressed by the very same provision in the Agreements.

The factors commonly considered in assessing whether an offering is public further weigh in favor of a finding that the sale of the interests here was a private transaction.

First, as to the number of offerees, Plaintiff does not dispute that there was no general solicitation of prospective investors, or that Plaintiff was one of only two offerees. (*See* Defs.' Mem. at 9; Defs.' Reply at 8–9.)

Second, with respect to the offerees' sophistication and experience, both Plaintiff and Investor #2 represented that their "knowledge and experience in financial and business matters in general and in speculative investments such as [Sterling and 4 Square] in particular, are such that [they are] capable of evaluating the merits and risks of investment in [Sterling and 4 Square]." (Am. Compl., Ex. D (Sterling Agreement), at 3; Am. Compl., Ex. E (4 Square Agreement), at 3–4.) They both also represented that they "had the opportunity to review th[e] Agreement[s] and consult with legal and other advisors of [their] choice." (Am. Compl., Ex. D (Sterling Agreement), at 8; Am. Compl., Ex. E (4 Square Agreement), at 9.)

Looking ahead to the fourth factor, although the size of the offering is not entirely clear,[5] the Agreements include several restrictions with respect to reselling the interests. Specifically, the

---

[5] Although the Agreements provide that Sterling and 4 Square will each make distributions to Plaintiff equal to forty percent of their net profits and ten percent of Plaintiff's initial investments, (Am. Compl., Ex. D (Sterling Agreement), at 1; Am. Compl., Ex. E (4 Square Agreement), at 1), it is unclear what Sterling's and 4 Square's net profits were, and what the size of the offering was therefore expected to be.

Agreements provide that (1) "there is not and will not be a public market for [Plaintiff's] Shareholder Interest in [Sterling and 4 Square] and that the transferability of [Plaintiff's] Shareholder Interest in [Sterling and 4 Square] is restricted"; (2) Plaintiff "shall have no unconditional right to give, sell, assign, pledge, hypothecate, exchange or otherwise transfer to another, all or any part of its Membership Interest in [Sterling or 4 Square]"; (3) Plaintiff "must give written notification of the proposed transfer to [Sterling or 4 Square] of the intention to sell [its] Membership Interest"; and (4) Plaintiff is investing in Sterling and 4 Square "solely for [its] own account, for investment purposes only, and intending to make a profit therefrom, and not with a view to distribute, sell, subdivide, or for the account of any other individual, corporation, firm or person." (Am. Compl., Ex. D (Sterling Agreement), at 3, 6; Am. Compl., Ex. E (4 Square Agreement), at 4, 6.)

Finally, as to the third factor—the nature and kind of information provided—the parties dispute whether Plaintiff had access to the information that would have been included in a registration statement. Plaintiff contends that it did not have access to various categories of information that the SEC requires to be included in a registration statement, including, *inter alia*, "the net proceeds derived from any security sold by the issuer during the two years preceding the filing of the registration statement," "any amount paid within two years preceding the filing of the registration statement," and copies of "any agreement . . . made with any underwriter." (Reply Decl. of Joel Taylor, Ex. D (Schedule A to the Exchange Act), ECF No. 63-2, at 2–3; *see also* Reply Decl. of Alexander Kravets, ECF No. 64, ¶ 3 (listing categories of information contained in Schedule A to the Exchange Act to which Plaintiff allegedly did not have access).) Plaintiff further claimed at oral argument that "[o]ne of those [missing] pieces of information is that [it] didn't

know, [it] wasn't told that Eric Brown . . . was convicted of a felony . . . which you are required to have in your registration statement." (Tr. of Oral Arg. dated June 25, 2019 at 51:16–22.)

In opposition, Defendants argue that Plaintiff had access to all information that would have been included in a registration statement, had one been required, (*see id.* at 73:20–21), and that Plaintiff "was keenly aware of [Eric Brown's] conviction" prior to purchasing the interests, (Defs.' Reply at 12). For example, Defendants allege that Kravets "went to look at the locations[,] looked at the leases[, and] looked at the bank statements and the computer runs." (Tr. of Oral Arg. dated June 25, 2019 at 73:20–74:1.) Defendants further allege that Kravets "asked about prior garages that he was aware of that [Defendants] had been involved with[,] some of them having gone to litigation, which he discovered through online searching." (*Id.* at 74:3–25.) In fact, Plaintiff does not identify any information that it sought to which it was denied access.

Any claim that Plaintiff did not have *access* to all relevant information it desired is belied by the undisputed evidence. Plaintiff itself represented that it "had an opportunity to engage in any and all due diligence required prior to the signing" of the Agreements and to consult legal and other advisors. (Am. Compl., Ex. D (Sterling Agreement), at 1, 8; Am. Compl., Ex. E (4 Square Agreement), at 1, 9.) With respect to Eric Brown's conviction, Defendants correctly note that a quick internet search reveals both the lawsuit and settlement, including on the SEC's website. (*See* Tr. of Oral Arg. dated June 25, 2019 at 20:13–17.) When questioned at oral argument about several of the other categories of information to which Plaintiff now alleges it had no access, Plaintiff conceded that it did not know whether any such information even existed. (*See id.* at 58:20–25; 65:3–66:9.)

Coupled with the limited number of offerees, the offerees' self-professed knowledge and experience, and the limitations placed on any resale of the interests, the facts clearly indicate that

the offering was private, and that Defendants were therefore not required to register the interests. *See Feldman*, 2010 WL 1993831 at *4 (finding that offering was private and registration was unnecessary, given that defendants "only solicited a small group of individuals to invest in the company," all investors represented in the agreement that they were sophisticated, the monetary size of the offering was "relatively small" and intended "only to raise about $2 million," and strict limitations were imposed with respect to resale). Accordingly, Plaintiff's Section 5 claim is dismissed because the interests, although securities, are exempt from registration under Section 4(a)(2) of the Securities Act.[6]

### IV. PLAINTIFF'S REMAINING CLAIMS ARE DISMISSED

Plaintiff also asserts claims against Eric Brown for violation of Section 10(b) and Rule 10b-5 of the Exchange Act, and for common law fraud and negligent misrepresentation. (Am. Compl. ¶¶ 55–84.) According to Plaintiff, these claims are based on (1) Eric Brown's alleged misrepresentation that the interests required no registration, and (2) Eric Brown's alleged failure to disclose his criminal conviction prior to Plaintiff's purchase of the interests. (*Id.* ¶ 2.)

Section 10(b) of the Exchange Act makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Under Rule 10b-5(b), it is unlawful for any person to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made . . . not misleading." 17 C.F.R. § 240.10b-5. Thus, to state a claim under Section 10(b) and Rule 10b-5, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter;

---

[6] Defendants alternatively argue that the interests are exempt from registration under Section 4(a)(1) of the Securities Act, which exempts "transactions by any person other than an issuer, underwriter, or dealer." 15 U.S.C. § 77d(a)(1). This Court need not address this alternative argument because it finds that the securities are exempt under Section 4(a)(2).

15

(3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *GAMCO Inv'rs, Inc. v. Vivendi Universal, S.A.*, 838 F.3d 214, 217 (2d Cir. 2016) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

Here, Plaintiff fails to sufficiently allege the first element: that Eric Brown made a "material misrepresentation or omission." Plaintiff alleges that Eric Brown misrepresented that the interests need not be registered. As discussed above, however, the interests are exempt from registration. Accordingly, no misrepresentation was made.

As to Eric Brown's alleged failure to inform Plaintiff of his conviction, Plaintiff does not demonstrate how any such failure to disclose publicly available information constitutes a material omission. "An omission is material if there is 'a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'" *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). "[A]n omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)). Such a duty "arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements." *Time Warner*, 9 F.3d at 268. "[T]here is no duty to disclose information to one who reasonably should be aware of it." *Seibert v. Sperry Rand Corp.*, 586 F.2d 949, 952 (2d Cir. 1978) (citation omitted). Rather, "[w]here allegedly undisclosed material information is in fact readily accessible in the public domain[,] a defendant

16

may not be held liable for failing to disclose this information." *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 576 (S.D.N.Y. 2013), *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

Here, even if Eric Brown intentionally failed to affirmatively disclose information about his conviction to Plaintiff, he had no duty to do so because it was a matter of public record. As noted above, Plaintiff could have easily learned about the conviction through, for example, a quick internet search. *See, e.g., Starr v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005) (finding alleged omissions immaterial, where prior company disclosures contained allegedly withheld information); *In re Bank of Am.*, 980 F. Supp. 2d at 576 (finding no omission where allegedly concealed information had been reported in several media outlets). As such, any alleged failure by Eric Brown to disclose his conviction was immaterial as a matter of law, and Plaintiff's claim under Section 10(b) and Rule 10b-5 must be dismissed.[7]

Having dismissed the only claims over which it has original jurisdiction, this Court declines to exercise supplemental jurisdiction over the remaining common law and state law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction"); *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 182 (2d Cir. 2004) ("The exercise of supplemental jurisdiction is left to the discretion of the district court[.]" (citation omitted)). Accordingly, Plaintiff's complaint is dismissed in its entirety.

---

[7] A separate and additional ground for dismissing Plaintiff's Section 10(b) and Rule 10b-5 claim is Plaintiff's failure to adequately allege loss causation. *See GAMCO*, 838 F.3d at 217. The complaint alleges that "Eric Brown's conviction and failure to register the Securities with the SEC have and will continue to impair the profitability of Sterling and 4 Square due to their inability to raise additional debt or equity financing" and "greatly diminishes the potential sale value of the Securities." (Am. Compl. ¶ 63.) Such conclusory and speculative allegations, without more, are insufficient to establish a causal connection between any alleged material omission and any loss that Plaintiff allegedly suffered.

## V. CONCLUSION

Defendants' motion to dismiss, (ECF Nos. 49, 52), is GRANTED. Plaintiff's cross-motion for partial summary judgment, (ECF Nos. 53, 54), is DENIED. The Clerk of Court is directed to close the motions, (ECF Nos. 49, 52, 53, 54), accordingly.

Dated: New York, New York
December 6, 2019

SO ORDERED.

*George B. Daniels*
GEORGE B. DANIELS
United States District Judge